# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

EVELINE BAMPOKY,

          Plaintiff,

v.

DAUBERT LAW FIRM, LLC, and
MICHAEL A. STUELAND,

          Defendants.

Case No. 20-CV-32-JPS

**ORDER**

## 1. INTRODUCTION

On January 8, 2020, Plaintiff Eveline Bampoky ("Plaintiff") filed a complaint against Daubert Law Firm, LLC ("Daubert"), a Daubert attorney, Michael A. Stueland ("Stueland"), Landmark Credit Union ("Landmark"), and Landmark Financial Services, Inc., alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e, and the Wisconsin Consumer Act ("WCA"), Wis. Stat. § 427.104, in connection with the collection of a credit card debt. (Docket #1). Subsequently, the parties stipulated to amend the original complaint, dismissing two causes of action and dismissing defendants Landmark Credit Union and Landmark Financial Services, Inc. (Docket #24). The Court adopted the stipulation. (Docket #35).

Plaintiff then submitted an amended complaint (now the operative complaint) which alleges that Daubert and Stueland (collectively, "Defendants") violated the aforementioned federal and state laws by demanding payment on a debt that the creditor (Landmark) had forgiven. (Docket #36 at 4–5). Plaintiff seeks statutory and actual damages and

attorney's fees. (*Id.* at 6). Defendants filed a motion for summary judgment on August 28, 2020, which included a motion to dismiss for lack of subject-matter jurisdiction. (Docket #27). These motions are now fully briefed, and, for the reasons stated below, the Court will deny them.

**2.     LEGAL STANDARD**

Defendants move to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1). Fed. R. Civ. P. 12(b)(1). When faced with a jurisdictional challenge, the Court accepts as true the well-pleaded factual allegations found in the complaint, drawing all reasonable inferences in favor of the plaintiff. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). In this context, the Court may also consider extrinsic evidence adduced by the parties. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

Defendants also move for summary judgment on the merits of Plaintiff's claim pursuant to FRCP 56. Fed. R. Civ. P. 56.  Under FRCP 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that

"we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

**3. RELEVANT FACTS**

This case is animated by a credit-card debt that grew more than three times in size over the course of a decade, and the various efforts to collect on that debt. In 2005, Plaintiff ran into difficulties paying the balance on a credit card she had with Landmark.[1] (Docket #29-1 at 8). When she ceased making payments after July 2005, Landmark sued her to collect her remaining balance. (*Id.*) Landmark filed its collection action on November 11, 2005, in Milwaukee County small claims court, case number 2005SC040482. (*Id.* at 9). Plaintiff failed to respond to or appear in that action. Accordingly, on December 16, 2005, the Milwaukee County court granted default judgment against Plaintiff for $3,961.86. (*Id.*)

Landmark unsuccessfully attempted to enforce the judgment through garnishment. (Docket #43 at 2). The parties dispute what happened next. Plaintiff contends she settled the debt directly with Landmark in early 2006, as evidenced by the tax form ("1099-C form") she later received; she did not, however, receive any communication from Landmark explicitly indicating the debt was cancelled or forgiven. (Docket #29-1 at 7, 13). Defendants argue that Plaintiff's account was "charged off" for accounting purposes in April 2006, but that she otherwise still owed the debt. (Docket #46 at 11). Landmark has no records of any communication to Plaintiff indicating the debt was forgiven, nor any records of collection activity on her account after 2006. (Docket #29-1 at 45–46). Regardless, after March 17,

---

[1] Plaintiff's now ex-husband opened this credit card in her name, without her knowledge, while the two were married, but they both used the credit card to make purchases. (Docket #29-1 at 15–16).

2006, Plaintiff did not receive any further billing statements from Landmark related to this account. (Docket #47 at 6). At no point did Plaintiff challenge the judgment or attempt to reopen the case in state court.

Three years later, in 2009, Landmark filed with the IRS, and sent Plaintiff, a 1099-C "Cancellation of Debt" form.[2] (*Id.* at 3). The 1099-C form listed Landmark as the creditor and indicated that $3,843.54 of Plaintiff's credit card debt had been "canceled" as of March 31, 2006. (*Id.*) Plaintiff states that she contacted Landmark when she received the 1099-C form and spoke with a Landmark employee who told her the debt was "closed" and "done." (Docket #29-1 at 12). However, Defendants challenge the reliability of this statement and its relevance to the meaning of the 1099-C form.

The parties' central disputes of fact are (1) why Landmark filed the 1099-C form with the IRS and (2) whether doing so could have meant that Landmark had forgiven Plaintiff's financial obligation. Under IRS regulations, creditors like Landmark were required to file 1099-C forms when any one of several specified "identifiable events" occurred. 26 C.F.R. § 1.6050P-1 (2021). The relevant identifiable events here include: (1) a decision or policy of the creditor to discontinue collection activity and discharge a debt, and (2) the expiration of a 36-month nonpayment "testing period," wherein the creditor has not received a payment on the debt for a three-year period ending on December 31. *Id.* The parties dispute which of these identifiable events could have triggered Landmark to issue the 1099-C to Plaintiff.

---

[2]Generally, a 1099-C signals to the individual taxpayer that she must include the debt referenced on the form in her taxable income for that tax year. *See* Internal Revenue Service, Publication 4681, *Canceled Debts, Foreclosures, Repossessions, and Abandonments (for Individuals)* (2020), *available at* https://www.irs.gov/pub/irs-pdf/p4681.pdf.

Defendants argue the second identifiable event—the expiration of the 36-month testing period—is the only possible explanation for Landmark's issuance of the 1099-C. In support of this position, Defendants cite testimony by Dean Berendt, Vice President of Collections at Landmark since 2010, (*Id.* at 34–57), as well as an affidavit from Robert Bruemmer, Executive Vice President at Landmark since 1987, to whom the Vice President of Collections reported during the relevant time period, (Docket #49). Berendt and Bruemmer stated that Landmark has not been able to locate any written policies from 2005–2009 that spell out (1) when it would close or cancel a debt or (2) when it would issue a 1099-C.

Landmark's *current* policy allows in-house collectors to recommend debt accounts to be either "charged off" (in which case, the debt is still owed, although collection activity may cease) or closed (the debt is cancelled or forgiven, and the debtor no longer owes it). (Docket #29-1 at 35–36). Currently, Landmark closes a debt only in limited circumstances: (1) when the debt is settled, (2) when the debt is released under a court order, (3) when the debt is discharged in bankruptcy, or (4) upon expiration of the statute of limitations. (*Id.*). And, currently, Landmark issues a 1099-C if and only if an identifiable event, as defined in IRS regulations, has occurred. (*Id.* at 37).

Defendants argue that Landmark's current policies point to a conclusion that Landmark would have treated Plaintiff's account the same way in 2006 as it would today. Landmark listed Plaintiff's account as "charged off" in 2006 and ceased (or at least has no records of) collection activity on the account. (*Id.* at 41, 44). Landmark has no records that show which identifiable event triggered issuance of this specific 1099-C to Plaintiff. (*Id.* at 42). However, Landmark never sent Plaintiff any

Page 5 of 17
Case 2:20-cv-00032-JPS   Filed 03/22/21   Page 5 of 17   Document 51

documentation showing that the judgment against her was satisfied or the debt was forgiven. (*Id.* at 13, 45). Therefore, in Defendants' view, the debt account was not closed, nor was it, for purposes of 1099-C issuance, cancelled pursuant to a Landmark decision or policy. Rather, the 1099-C must have been issued due to the only other applicable identifiable event: the expiration of the testing period. In other words, Defendants characterize Landmark's issuance of the 1099-C as a compliance measure, not necessarily reflecting a change in Landmark's ability or intention to collect on Plaintiff's debt.

Conversely, Plaintiff argues that the identifiable event triggering Landmark's issuance of the 1099-C could not possibly have been the expiration of the nonpayment testing period, but rather must have been the other event: a decision or policy of Landmark to cease collection and discharge the debt. In support of her position, Plaintiff offers an accountant's expert report (the admissibility of which Defendants challenge in their reply brief). (Docket #44-4).

Plaintiff's expert states that a 1099-C issued due to the nonpayment testing period identifiable event would have listed the date of cancellation as December 31 of the year in which the three-year nonpayment testing period expired—in this case, December 31, 2008. (*Id.*) Plaintiff made her last payment on the account in July 2005, and her 1099-C form gives March 31, 2006 as the debt cancellation date. Because the given cancellation date is not December 31 and because fewer than 36 months elapsed between Plaintiff's final payment and the listed cancellation date, the expert report concludes it is more likely than not that Landmark issued the 1099-C due to the "creditor's decision to cancel" identifiable event. (*Id.*) Plaintiff and her expert highlight Landmark's lack of written policies regarding charge-offs,

closures, and 1099-C issuance for the 2005–2009 period—as well as the fact that Berendt did not work for Landmark in that period and was not personally familiar with its practices then—as indicative that Landmark at least *could* have decided to cancel her debt and issued the 1099-C as a result of such a decision. (*Id.*) Finally, Plaintiff asserts that Landmark's cessation of collection activity is consistent with a decision to forgive her debt.

Returning to the undisputed facts: the current litigation arose from Defendants' collection actions, which occurred ten years after Plaintiff received the 1099-C form. Working with a third-party vendor, Aries Data Collection, Landmark placed a number of its accounts for collection, including Plaintiff's. In January 2019, Landmark retained Defendant Daubert Law Firm to collect the 2005 default judgment on Plaintiff's account. On January 10, 2019, Daubert sent Plaintiff a notice of the collection action, which indicated her account had grown to a balance of $10,178.69 due to post-judgment interest. On January 14 Defendant Stueland, an attorney with the Daubert firm, entered a notice of appearance in the collection action in the Milwaukee County court.

Around this time, Plaintiff visited a Landmark branch and spoke with several employees about the letter, but none could tell her conclusively whether the debt was still owed or whether Daubert's collection efforts were legitimate. On January 21, she contacted Daubert to verify the debt, which Daubert did in a letter afterwards. During that conversation, Plaintiff stated that Landmark had cancelled the debt, and the Daubert representative Plaintiff spoke with took note of her statement and advised Plaintiff to provide proof of the cancellation. (Docket #44-1 at 16). Daubert asserts it had no knowledge of Plaintiff's 1099-C form before Plaintiff commenced the current litigation. In any event, the lawfulness of

Page 7 of 17
Case 2:20-cv-00032-JPS   Filed 03/22/21   Page 7 of 17   Document 51

Defendants' collection action turns on the outcome of the disputed facts, described above, as to the significance of the 1099-C form for the legal status of Plaintiff's debt.

**4.  ANALYSIS**

The sole issue for this Court on summary judgment is whether the evidence in the record would allow a jury to conclude that Landmark cancelled the debt that Plaintiff owed it after a state-court judgment was entered, but before Defendants attempted to collect it. Prior to reaching this issue, however, the Court will analyze Defendants' challenge to its jurisdiction under the *Rooker-Feldman* doctrine.

**4.1  Defendants' Motion to Dismiss Pursuant to the *Rooker-Feldman* Doctrine**

Defendants first argue that the Court should dismiss this case for lack of subject-matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine provides that "the Supreme Court of the United States is the only federal court that may review judgments entered by state courts in civil litigation." *Harold v. Steel*, 773 F.3d 884, 885 (7th Cir. 2014); *see also Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Thus, lower federal courts are prohibited from presiding "over claims seeking review of state court judgments . . . no matter how erroneous or unconstitutional the state court judgment may be." *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000). The doctrine likewise prohibits federal jurisdiction over claims which are "inextricably intertwined" with state court determinations. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017). "Notably, the *Rooker-Feldman* doctrine is a narrow one . . . . For a federal claim to be barred, 'there must be no way for the injury complained of by [the] plaintiff to be separated from [the] state court judgment.'" *Id.* (quoting

*Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016)). The *Rooker-Feldman* doctrine is confined to cases in which the parties are "inviting district court review and rejection of [state-court] judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

In the present case, there is no dispute as to whether the state-court judgment against Plaintiff was valid. Plaintiff is not asking this Court to reject the judgment—let alone perform any review over it. Plaintiff is asking this Court to find that Defendants violated the FDCPA and WCA when they attempted to collect on a debt which they knew had been cancelled *after* the valid, state-court judgment was entered.

Defendants attempt to analogize the present facts to those of other cases—but none of their cited cases contain comparable timelines or underlying arguments to those of this case. For example, Defendants cite *Mizysak v. LVNV Funding, LLC*, No. 18-CV-1400, 2020 WL 956355, at *7 (E.D. Wis. Feb. 27, 2020). In that case, the plaintiff's identity was stolen in 2005, and debt was taken out in her name. *Id.* at *1. In 2007, without the plaintiff's knowledge, GE Money sold the debt to Arrow Financial, and Arrow Financial obtained a default judgment in a Wisconsin court against the plaintiff. *Id.* Then, in 2010, the plaintiff learned about the identity theft, and, when she called the original creditor, GE Money, she was told that the debt would be "wipe[d]" from her account. *Id.* Arrow Financial later assigned the default judgment against the plaintiff to LVNV in 2011, and Daubert and Stueland (Defendants in the present case) took over collection activities on the debt. *Id.* The plaintiff attempted to show proof that she was the victim of identity theft and, therefore, did not owe the debt. *Id.* Eventually, the plaintiff sued in federal court under the FDCPA and WCA, arguing that

"[the defendants] tried to collect on a debt they knew that [the plaintiff] didn't owe, [and] ignored evidence of identity theft." *Id.* at *4.

The defendants argued that the plaintiff's claims were "inextricably intertwined with the state court judgment" and that the plaintiff's "real gripe is that she was subject to collection of a judgment debt resulting from an alleged identity theft." *Id.* at *5. The court agreed and dismissed the case pursuant to the *Rooker-Feldman* doctrine. *Id.* at *6. The court wrote,

> The alleged impropriety of all of the defendants' conduct derives from the fact that [the plaintiff] was not liable for the debt [*because of the identity theft*]. But the state court, by virtue of entering a default judgment, had already said that she was responsible for the debt. To find that the defendants violated the FDCPA and WCA as alleged by [the plaintiff] would require finding that [the plaintiff] was not liable for the underlying debt. Consequently, [the plaintiff's] claims are "not independent of nor extricable from the state-court judgment." *Mains v. Citibank, N.A.*, 852 F.3d 669, 677 (7th Cir. 2017) (finding plaintiffs' FDCPA claims were barred under *Rooker-Feldman* in light of a state court foreclosure judgment). Rather, "the state court's judgment is the source of the injury of which plaintiff[] complain[s] in federal court." *Harold*, 773 F.3d at 885.

*Id.*

In the present case, Plaintiff is not challenging the underlying validity of the judgment or her debt. The timeline of Plaintiff's situation is as follows: (1) debt was incurred under Plaintiff's name; (2) Plaintiff ceased making payments in 2005; (3) in December 2005, a Milwaukee County Court granted default judgment against Plaintiff; (4) Plaintiff alleges that she subsequently settled the debt in 2006; and (6) in 2009, Landmark filed with the IRS and sent Plaintiff a 1099-C form which Plaintiff alleges shows proof that the debt was cancelled. The plaintiff in *Mizysak* attempted to use

a federal court to challenge whether she actually owed the underlying debt which was fraudulently taken out in her name despite the state court having already determined that the debt was valid. In contrast, Plaintiff here is attempting to use a federal court to challenge whether her valid debt was later forgiven by the creditor. The state-court judgment was a determination that Plaintiff owed money as of December 2015. It says nothing about whether Plaintiff owed money at any time after that. Plaintiff likens her situation to one in which a debtor has paid her debt in full. (Docket #41 at 4). She argues that, in that situation, the Court would have no issue concluding that a debt obligation ceased without any harm to a state-court judgment. The Court finds this comparison and reasoning persuasive.

Defendants appear to believe that once a debt is reduced to a state-court judgment, it can no longer be forgiven by the creditor or extinguished by the debtor via payment-in-full. That is not true. While a judgment gives a creditor certain remedies (such as garnishment), a judgment does not make debts incapable of forgiveness, cancelation, or extinguishment. Here, it is not the validity of the state-court judgment that is in question, but rather the validity of an alleged cancellation of the debt. Accordingly, the Court will not dismiss this case for lack of subject-matter jurisdiction under the *Rooker-Feldman* doctrine.[3]

---

[3]The other cases which Defendants cite are similarly not analogous to the present case. *See, e.g.*, *Mains*, 852 F.3d at 676 (dismissing a case on *Rooker-Feldman* doctrine where "the foundation of the . . . suit [was] . . . that the state court's foreclosure judgment was in error because it rested on a fraud perpetrated by the defendants"); *Kelley v. Med-1 Sols., LLC*, 548 F.3d 600, 605 (7th Cir. 2008) ("We could not determine that defendants' [allegedly fraudulent] representations and requests related to attorney fees violated the law without determining that the state court erred by issuing judgments granting the attorney fees."); *Derksen v.*

### 4.2 Defendants' Motion for Summary Judgment on the Merits of Plaintiff's FDCPA and WCA claims

Defendants next argue that they are entitled to summary judgment on the merits of Plaintiff's claim under the FDCPA and WCA. The FDCPA prohibits debt collectors from falsely representing a "threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). The WCA similarly prohibits debt collectors from "[c]laiming, or attempt[ing] or threaten[ing] to enforce a right with knowledge or reason to know that the right does not exist." Wis. Stat. § 427.104. Plaintiff alleges that "Daubert falsely represented that money was owed when in fact, [Landmark] forgave the debt a decade earlier" as evidenced, in part, by issuance of a 1099-C form, and Defendants' attempt to collect the debt is, therefore, illegal. (Docket #36 at 4). In their motion for summary judgment, Defendants argue that the only piece of evidence that could show Landmark cancelled Plaintiff's debt is the 1099-C form, and, under existing law, a 1099-C form, on its own, is insufficient to demonstrate that a debt was cancelled. (Docket #28). Plaintiff responds that the totality of the record, which includes more than just the 1099-C form, would allow a reasonable jury to conclude that, under existing law, Landmark cancelled the debt. (Docket #41).

---

*Rausch Strum Israel & Hornik, SC*, No. 09-CV-588, 2010 WL 3835097, at *2 (E.D. Wis. Sept. 29, 2010) ("In this case, having this court rule that the contract between Mrs. Derksen and Citibank was somehow illegal or that there was insufficient evidence to prove that Mrs. Derksen owed a debt to Citibank would necessitate that this court find that the state court erred in entering its judgment."). In all of these cases, the plaintiffs were challenging whether they owed the underlying debt in light of some issue (e.g., fraud) underlying the state-court judgment. In this case, that is not what Plaintiff is attempting to do.

As discussed previously, under an IRS regulation in effect when the default judgment was rendered and the tax form was issued, creditors were required to file a 1099-C form when any one of several specified "identifiable events" occurred. 26 C.F.R. § 1.6050P-1. The regulation states that a discharge of indebtedness "is deemed to have occurred" upon the happening of an identifiable event *"[s]olely for purposes of the reporting requirements." Id.* § 1.6050P-1(a)(1) (emphasis added). The IRS, through information letters, has stated that the IRS "does not view a Form 1099-C as an admission by the creditor that it has discharged the debt and can no longer pursue collection." Info. Letters, IRS INFO 2005-0207, 2005 WL 3561135 (Dec. 30, 2005). The IRS further explained its view that, upon the issuance of a 1099-C form, "a discharge of indebtedness is deemed to have occurred upon the occurrence of an identifiable event *whether or not there is an actual discharge of indebtedness*." Info. Letters, IRS INFO 2005-0208, 2005 WL 3561136 (Dec. 30, 2005) (emphasis added). "Section 6050P and the regulations do not prohibit collection activity after a creditor reports by filing a Form 1099-C." *Id.*

Circuits are split as to the impact a 1099-C form has on a creditor's ability to later pursue collection of a debt. A minority of courts agree that the issuance of a 1099-C form creates a prima-facie showing that a debt has been cancelled by the creditor. Unless the creditor can offer evidence to the contrary (e.g., evidence that it filed the form by mistake or in conformance with another triggering event), the creditor is no longer permitted to pursue collection. *See, e.g., In re Reed*, 492 B.R. 261, 271 (Bankr. E.D. Tenn. 2013) ("the court does not agree that the [IRS]'s interpretation that the filing of a Form 1099-C does not prohibit further collection of an indebtedness against a debtor is entitled to deference when a debtor has, as required by the [IRS],

relied upon the Form 1099-C and included the discharged or cancelled debt in gross income for the purpose of determining the debtor's taxable income"). The majority approach, on the other hand, agrees with the IRS's understanding of the effect of a 1099-C form. *See, e.g.*, *In re Riley*, 478 B.R. 736, 744 (Bankr. D.S.C. 2012) ("Defendant['s] . . . credit report and the Form 1099-C are the only evidence presented in support of this argument [that his debt was cancelled]; those documents are not dispositive, and there is no evidence that the note has been satisfied.").

The Seventh Circuit has offered no guidance on this issue, leaving this Court with only a few district court opinions in this circuit from which to seek guidance. One decision, *Mennes v. Cap. One, N.A.*, No. 13-CV-822-BBC, 2014 WL 1767079, at *6 (W.D. Wis. May 5, 2014), adopts the majority view: "the filing of a 1099-C form does not by itself evidence debt cancellation as a matter of law." Judge Crabb held that the IRS information letters "weigh[ed] heavily in favor of the majority view" and were persuasive, considering "that the regulation requires the filing of Form 1099-C regardless [of] whether the debt has actually been discharged, and that actual discharge of the debt is only one of the identifiable events that triggers the filing of a 1099-C form." *Id.* (applying *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) to determine the level of deference to give to the IRS's nonbinding information letter). This Court agrees and will consider the 1099-C form issued by Landmark as insufficient, on its own, to establish a *prima-facie* showing that Plaintiff's debt was cancelled. *See id.* (dismissing some of plaintiff's claims without prejudice but allowing him to refile his claims "[b]ecause it [was] possible that plaintiff can produce evidence that an actual discharge occurred in his case" beyond the 1099-C form).

Here, Defendants argue that "Plaintiff's sole basis for claiming Landmark 'forgave' or 'cancelled' the Judgment is Landmark's filing of the Form 1099-C," and that "Plaintiff has no other evidence that Landmark discharged, satisfied, 'cancelled', or 'forgave' the [a]ccount debt or the Judgment." (Docket #28 at 9). Based on this, Defendants argue that "Plaintiff's claim fails as a matter of law." (*Id.* at 10). Plaintiff argues that she has offered a sufficient amount of additional evidence (beyond just the 1099-C form) that the debt was cancelled, such that a reasonable jury could find that the debt was cancelled.

For example, Plaintiff discusses that Landmark ceased all efforts to collect on the judgment around the time at which it issued the 1099-C form. Specifically, Landmark stopped sending statements and did not make any further attempts to collect the debt for nearly ten years. (Docket #43 at 3). Defendants do not contest this fact. (Docket #47 at 5–6). Defendants instead respond that because "[j]udgments are collectible in Wisconsin for 20 years . . . . [t]here is no requirement that collection of the judgment be continuous or uninterrupted, or that the judgment creditor continue[] to send statements." (Docket #46 at 12). While this might be true—a creditor might not be required to continuously and diligently pursue debt collection—it does not resolve the factual issue of whether the debt was forgiven or whether Landmark was not actively pursuing the debt. A reasonable jury may consider the lack of collection efforts in connection with the timing of events (i.e., the issuance of the 1099-C form) to determine that the debt was forgiven. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not . . . decide which inferences to draw from the facts; these are jobs for a factfinder.").

Plaintiff also points out that there is no evidence of which event triggered Landmark issuing the 1099-C form (i.e., actual cancellation of the debt or another event). (Docket #41 at 15–16). Defendants offer testimony from Landmark's corporate representative that Landmark now cancels debt only when it is discharged in bankruptcy or settled, the statute of limitations expires, or there is a court order. (Docket #28 at 9; #29-1 at 35–36). But Landmark "admits that Landmark is unable to locate any written policy from 2005–2009 regarding the issuance of 1099-C forms or the cancellation of debt." (Docket #49 at 1). Landmark also states that "[t]here are no employees at Landmark that were employed during the period of 2005–2009 that would have known that policy." (*Id.*) Thus, the recitation of Landmark's policy is based only on the testimony of the corporate representative. There is also testimony from Dean Bernendt, Landmark's Vice President of Collections, that Landmark has no records that show why the 1099-C form was issued to Plaintiff.[4] (Docket #29-1 at 43). There remain open questions of material fact in this case as to why the 1099-C form was issued and whether Plaintiff's debt was cancelled. At the summary judgment stage, the Court is "not in a position to make credibility findings" or to resolve inferences—that is the job of a factfinder, and the Court "must pass the case to the next phase of litigation." *Massey v. Cassens & Sons, Inc.*, No. 05-CV-598-DRH, 2007 WL 2710490, at *3 (S.D. Ill. Sept. 13, 2007).

5.  **CONCLUSION**

For the reasons explained above, the Court will not dismiss this action for lack of subject matter jurisdiction. The Court also will deny

---

[4] "Q: Are there any records that exist that show why Landmark issued that 1099-C in early 2009? A: No. I haven't seen any records outside of the [1099-C] form." (Docket #29-1 at 43).

summary judgment to Defendants. There remain genuine disputes as to material facts, and the Defendants are not entitled to judgment as a matter of law.

The Court will grant Plaintiff's motion to seal, (Docket #45), and the relevant submission, (Docket #44-7), will be sealed, as it contains confidential tax information. Finally, Plaintiff's motion for leave to file a surreply and to supplement the record, (Docket #50), will be denied, as the Court found sufficient evidence in the record to deny Defendants' motion for summary judgment without having to address the admissibility of Plaintiff's expert report, at issue in the proposed surreply.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss and motion for summary judgment (Docket #27) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to seal document (Docket #45) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a surreply and to supplement the record (Docket #50) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of March, 2021.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge